UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTINE DORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 12-40023-TSH |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS REGARDING DENIAL OF
SUPPLEMENTAL SECURITY INCOME BENEFITS**

March 29, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Christine Dorman ("Dorman") has brought this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), challenging the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying her claim for Supplemental Security

Income ("SSI") benefits.  The matter is presently before the court on the "Plaintiff's

Motion to Reverse" (Docket No. 11), by which the plaintiff is seeking an order vacating

the Commissioner's decision and remanding the matter to the Social Security

Administration for further administrative proceedings.  It is also before the court on the

"Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 12), by which

the Commissioner is seeking an order affirming his decision to deny Dorman's claim for benefits.

The fundamental issue raised by the parties' motions is whether the testimony of a vocational expert, on which the Administrative Law Judge ("ALJ") relied in making his determination that Dorman was not disabled, was fundamentally flawed because it was based on unreliable estimates regarding the availability of jobs existing in the national and regional economies, and because it was based on a hypothetical question which reflected an improper assessment of Dorman's residual functional capacity.  As described below, this court finds that because the VE's job number testimony was based solely on raw numbers taken from a computer software program and did not reflect any expertise on the part of the VE, it was unreliable and requires a remand to the Social Security Administration.  While this court also finds that the hypothetical question at issue did not sufficiently capture all of the plaintiff's mental limitations, this court concludes that this error was harmless.  Nevertheless, in light of this court's determination that a remand is warranted, this court recommends that the ALJ revisit his finding regarding the plaintiff's mental residual functional capacity.  Accordingly, and for all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Commissioner's motion to affirm be DENIED, that the plaintiff's motion to reverse be ALLOWED, and that the matter be remanded to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.  <u>STATEMENT OF FACTS</u>[1]

Dorman was born on September 9, 1960, and was 50 years old at the time of her hearing before the ALJ.  (Tr. 38, 155).  She completed only one year of high school and has never obtained a GED.  (Tr. 38, 180).  In 1998 and 1999, Dorman briefly held jobs as a waitress at a doughnut shop and as a housekeeper at a nursing home, and in about 2008 or 2009, she provided some housekeeping services to friends and acquaintances.  (Tr. 38-41, 232).  However, she has never worked in any significant capacity, and has relied mainly on a spouse, a boyfriend or welfare as a source of support.  (<u>See</u> Tr. 38-40; 232, 436).

The record reveals that Dorman has a history of wrist surgery and substance abuse, and that she suffers from a number of physical and mental health conditions, including depression, chronic back pain, and bursitis in her hip.  (<u>See</u>, <u>e.g.</u>, Tr. 402, 404, 436-40, 442, 461, 529, 535-36, 572).  Dorman claims that she stopped working due to her medical problems, and that she remains incapable of working as a result of her depression, chronic back pain, and difficulties with her hand.  (Tr. 42, 176, 436).

### <u>Procedural History</u>

Dorman filed an application for SSI benefits on July 23, 2009, claiming that she has been unable to work since February 1, 1983 due to a bad hand, a bad back and

---

[1]  References to pages in the transcript of the record proceedings shall be cited as "Tr. __."  The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 21.

depression.[2]  (Tr. 155, 176).  She subsequently amended the alleged onset date of her

disability to July 23, 2009.  (Tr. 37).  The plaintiff's application was denied initially on

November 23, 2009, and upon reconsideration on June 9, 2010.  (Tr. 77-78, 83-89).

The plaintiff requested and was granted a hearing before an ALJ, which took place

on July 26, 2011.  (Tr. 34-72, 93, 95-96).  Dorman, who was represented by counsel,

appeared and testified at the hearing.  (Tr. 38-57).  In addition, the ALJ elicited testimony

from a vocational expert ("VE"), which testimony included responses to hypothetical

questions designed to determine whether jobs exist in the regional and national

economies for an individual with the same age, educational background, past work

experience, and residual functional capacity ("RFC") as the plaintiff.  (See Dec. 8, Tr. 28;

Tr. 57-61).  As described below, Dorman contends that the VE's testimony was flawed

because the hypothetical questions that were posed to him by the ALJ contained an

inaccurate description of the plaintiff's mental RFC, and because his testimony about the

number of jobs available in the national and regional economies was unreliable.

Significantly, in the first hypothetical, the ALJ asked the VE to assume that

> the individual retains the residual functional capacity for work
> with the following additional limitations, she would be
> limited to light work.  There would [be] no more than
> occasional climbing, stooping, bending, balancing or twisting.
> There would be no kneeling or crawling, no heights of
> ladders, no hazards or dangerous machinery.  **She would be**

---

[2]  On July 23, 2009, Dorman also filed an application for disability insurance benefits
pursuant to Title II of the Social Security Act, but that claim was later dismissed by the ALJ at
Dorman's request.  (Tr. 37, 148-54).

> **limited to simple routine repetitive tasks which require
> limited concentration**.

(Tr. 57-58 (emphasis added)).  The ALJ then asked the VE whether, given those

limitations, an individual with Dorman's age, education and work experience would be

capable of performing any jobs.  (Id.).  The VE testified that a claimant having those

restrictions would be able to perform certain jobs on a full time basis, including the

unskilled, light duty jobs of cafeteria attendant (DOT 311.677-010), parking lot attendant

(DOT 915.473-011) and price marker (DOT 209.587-034).[3]  (Tr. 58-59).  He further

testified that there were over 10,000 cafeteria attendant jobs, over 4,000 parking lot

attendant jobs, and over 42,000 price marker jobs in Massachusetts, and over 402,000

cafeteria attendant jobs, over 129,000 parking lot attendant jobs, and over 1.8 million

price marker jobs throughout the national economy.  (Id.).

 The VE was then asked to respond to a number of additional hypothetical

questions that were posed to him by the ALJ and counsel for the plaintiff.  (See Tr. 59-

61).  Significantly, during his questioning, the plaintiff's counsel asked the VE whether

any of the jobs that the VE had identified would be precluded if it were assumed that the

claimant's work pace would be uneven due to her pain.  (Tr. 60-61).  The VE responded

that under such circumstances, the claimant would not be capable of performing the job

of a parking lot attendant.  (Tr. 61).  However, he stated that as long as she could remain

---

[3] "DOT" refers to the Dictionary of Occupational Titles issued by the Department of
Labor.  The Social Security Administration takes administrative notice of "reliable job
information" set forth in the DOT.  See 20 C.F.R. § 416.966(d).

productive, an uneven pace would not preclude her from performing work as a price

marker or cafeteria attendant because those jobs are self-paced.  (Id.).

Subsequently, the plaintiff's counsel asked the VE to describe the source of the

numbers of jobs that he had given in response to the ALJ's first hypothetical question.

(Id.).  The VE explained that he obtained his numbers from Job Browser Pro, a software

program which is provided by a commercial service known as "SkillTran," and which

relies on data from the Bureau of Labor Statistics.  (See Tr. 61, 67-68).  He also

explained that the numbers he provided did not correspond to specific DOT code-

identified jobs, but were instead drawn from groups of occupations, identified by

standard occupational category ("SOC") codes, which include jobs that are similar but

require a range of aptitudes.  (Tr. 61-63).  For example, the VE explained that the SOC

code encompassing the price marker job covers 38 different DOT code-identified

occupations that require differing skill and exertional levels.  (Tr. 62-63).  Consequently,

the 42,000 number he provided for price marker jobs in Massachusetts included all 38

occupations encompassed by the relevant SOC code.  (See Tr. 64).

The ALJ challenged the validity of the VE's numbers on the grounds that they

were over-inclusive and did not reflect the true number of the DOT code-identified

occupations identified by the VE in response to the hypothetical question.   (Tr. 64-65).

In response to the ALJ's criticism, the VE adjusted the numbers to reflect only the

numbers of jobs available for the price marker, parking lot attendant and cafeteria

attendant occupations.  (See Tr. 64-66).  Specifically, the VE testified that there were

1,286 parking lot attendant, 3,498 cafeteria attendant, and over 10,000 price marker positions in Massachusetts, and over 459,000 price marker, over 34,000 parking lot attendant, and over 138,000 cafeteria attendant jobs in the national economy.  (Tr. 65-66).  He further testified that he obtained those numbers from the SkillTran software. (Tr. 67). The VE's job number testimony was based solely on the SkillTran information and did not include any evaluation based on his own knowledge and experience.  (See Tr. 71).

In his written decision denying Dorman's claim for SSI benefits, the ALJ adopted the RFC described in his first hypothetical question to the VE, ignoring the plaintiff's alleged uneven work pace as a result of her pain.  (See Dec. 4, Tr. 24).  The ALJ also relied on the VE's revised numbers in support of his conclusion that Dorman was not disabled.  (See Dec. 8, Tr. 28).

The ALJ issued his decision denying Dorman's application for SSI benefits on September 7, 2011.  (Tr. 18-29).  The plaintiff appealed the ALJ's decision to the Appeals Council, and on December 27, 2011, the Appeals Council denied her request for review.  (Tr. 1-7).  Accordingly, the plaintiff has exhausted all of her administrative remedies, and the case is ripe for review by this court pursuant to 42 U.S.C. § 405(g).

### The ALJ's Decision

The ALJ concluded that from February 1, 1983 through the date of his decision on September 7, 2011, Dorman had not been "under a disability, as defined in the Social Security Act," which defines "disability" as "the inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (Dec. 2 and Finding #10, Tr. 22, 28). <u>See also</u> 42 U.S.C. § 1382c(a)(3)(A). There is no dispute that the ALJ, in reaching his decision, applied the five-step sequential evaluation required by 20 C.F.R. § 416.920. The procedure resulted in the following analysis, which is detailed in the ALJ's "Findings of Fact and Conclusions of Law." (<u>See</u> Dec. 3-8, Tr. 23-28).

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity[.]" <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. <u>See id.</u> In the instant case, the ALJ determined that Dorman had not engaged in substantial gainful activity since July 23, 2009, the amended alleged onset date of her disability. (Dec. Finding #1, Tr. 23). Accordingly, the ALJ proceeded to the next step in the analysis.

The second inquiry is whether the plaintiff has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). If not, the claimant is considered not disabled and the application for benefits is denied. <u>See Seavey</u>, 276 F.3d at 5. Here, the ALJ concluded that Dorman suffered from several severe impairments, including depressive disorder, trochanteric bursitis in her hips, and back pain. (Dec. Finding #2, Tr. 23). Thus, although as described below Dorman argues

8

that the ALJ improperly ignored evidence that she also suffered from anxiety and

personality disorders, which were "in all likelihood, severe" (Pl. Mot. (Docket No. 11) at

8), it is undisputed that the ALJ appropriately proceeded to step three of the evaluation

process.

The third inquiry is whether the claimant has an impairment equivalent to a

specific list of impairments contained in Appendix I of the Social Security regulations, in

which case the claimant would automatically be found disabled.  See Seavey, 276 F.3d at

5; 20 C.F.R. § 416.920(d).  At this step, the ALJ concluded that Dorman's impairments,

either alone or in combination, did not meet or medically equal any of the listed

impairments.  (Dec. Finding #3, Tr. 23).  Therefore, his analysis continued.

The fourth inquiry asks whether "the applicant's 'residual functional capacity' is

such that he or she can still perform past relevant work[.]"  Seavey, 276 F.3d at 5.

Accordingly, it was at this stage in the procedure that the ALJ determined Dorman's

RFC.  Specifically, the ALJ determined as follows:

> [a]fter careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 416.967(b) **except she can
> only perform simple, routine repetitive tasks, which require
> limited concentration**.  She can no more than occasionally climb,
> stoop, bend, balance, and twist.  The claimant should never kneel or
> crawl.  Finally, she should avoid all exposure to hazards such as
> unprotected heights and dangerous moving machinery.

(Dec. Finding #4, Tr. 24 (emphasis added)).  Dorman contends that this finding is not

supported by substantial evidence because the ALJ failed to account for Dorman's

moderate limitations in social functioning and in her ability to maintain concentration, persistence or pace.  (Pl. Mot. at 8-12).  As described below, this court finds that the ALJ's treatment of these matters, while not ideal, did not in and of themselves constitute reversible error.

In reaching his conclusion regarding Dorman's RFC, the ALJ provided a description of the available medical records pertaining to the plaintiff's physical and mental health conditions.  (Dec. 5-7, Tr. 25-27).  The ALJ noted that the plaintiff only began seeking regular care outside of the emergency room in August 2009, when she established a primary care relationship with Community Health Connections.  (Dec. 5, Tr. 25).  With respect to the plaintiff's mental health conditions, which are at issue in this case, the ALJ noted that Dorman was first referred to psychiatric care in January 2010, after complaining about depression to her primary care provider.  (Id.; see also Tr. 413-21).  At that time, the plaintiff was diagnosed with a moderate major depressive disorder and rule out post-traumatic stress disorder, and was assessed as having a Global Assessment of Functioning ("GAF") of 45.[4]  (Dec. 5, Tr. 25; see also Tr. 420).

The ALJ stated that in rendering his conclusions regarding Dorman's mental limitations, he had given great weight to the opinion of Mark Brooks, Ph.D., a consulting psychologist.  (Dec. 6, Tr. 26).  As the ALJ described in his decision, Dr. Brooks performed a psychological evaluation of the plaintiff on November 10, 2009.  (Id.).  In

---

[4] A GAF score between 45 and 50 "indicat[es] serious symptoms or serious impairment in functioning ...."  Campbell v. Astrue, 627 F.3d 299, 303 (7th Cir. 2010).

his report of the evaluation, Dr. Brooks noted, among other things, that Dorman was able to perform activities of daily living, but only at her own pace, that Dorman reported having no problems with concentration, persistence or pace, and that the plaintiff did not report any specific problems interacting with others, although she did indicate that she isolates herself.  (Dec. 6, Tr. 26; see also Tr. 438-39).  Dr. Brooks diagnosed Dorman with depressive disorder not otherwise specified, anxiety disorder not otherwise specified, cannabis abuse, cocaine dependence in full sustained remission, and personality disorder not otherwise specified, and he assessed Dorman as having a GAF of 65.[5]  (Dec. 6, Tr. 26; see also Tr. 439).

The ALJ also considered the findings of Ruth Aisenberg, Ph.D., an agency psychologist who completed a psychiatric review technique ("PRTF") form for the plaintiff, and provided a written assessment of Dorman's mental RFC.  (See Dec. 6-7, Tr. 26-27; Tr. 449-66).  As the ALJ noted in his decision, Dr. Aisenberg concluded that the plaintiff retained the mental capacity to concentrate on routine tasks for up to 2 hours over the course of an 8 hour period and could complete them, but that her pace would be variable due to pain and her psychiatric symptoms.  (Dec. 6-7, Tr. 26-27; see also Tr. 465).  Dr. Aisenberg also determined that despite Dorman's reported reluctance to leave

---

[5]  A GAF score of 65 "indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.'"  Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. rev. 2000)) (alteration in original).

home, she would be able to do so as needed.  (Dec. 7, Tr. 27; <u>see also</u> Tr. 465).

Moreover, Dr. Aisenberg found that Dorman had a limited ability to adapt to stress, but

that she remained capable of completing simple, routine tasks.  (<u>Id.</u>).  The ALJ found that

Dr. Aisenberg's assessment was consistent with Dr. Brooks' findings regarding the

plaintiff's mental limitations.  (Dec. 7, Tr. 27).

Following his consideration of the medical evidence, the ALJ determined that

while the plaintiff's impairments "could reasonably be expected to cause the alleged

symptoms," her complaints as to the intensity, persistence and limiting effects of those

symptoms were not entirely credible.  <u>Id.</u>  In particular, the ALJ stated as follows with

respect to the plaintiff's alleged mental limitations:

> [a]lthough the claimant alleges disability due to depression and
> anxiety, she has taken Zoloft that is prescribed by her primary care
> physician, which she found helpful.  She does not participate in
> therapy for her psychiatric symptoms.  Finally, the Administrative
> Law Judge gives great weight to the findings of Dr. Brooks because
> although she alleged disability due to depression and anxiety, she
> could not describe symptoms of depression or anxiety that limited
> her ability to perform her activities of daily living, social functioning
> or concentration persistence or pace.  **She has some limitations in
> her ability to maintain concentration, persistence or pace because
> of her subjective complaints of pain and depression**.  However, the
> claimant is able to perform tasks at her own pace.

(<u>Id.</u> (emphasis added)).  As described below, this court finds that the ALJ did not

adequately account for the limitations in Dorman's ability to maintain a consistent work

pace in his finding regarding her mental RFC and in his hypothetical question to the VE.

Nonetheless, this court also concludes that even if the ALJ had done so, it would not have

altered the VE's opinion that Dorman retained the capacity to perform full time work, as evidenced by the VE's response to plaintiff's counsel's questioning at the hearing.

After explaining the basis for his RFC determination, the ALJ found that Dorman had no past relevant work. (Dec. Finding #5, Tr. 27). Consequently, the ALJ reached the fifth and last step in the sequential analysis.

The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, the claimant is capable of performing other work. See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(g). If so, the claimant is not disabled. 20 C.F.R. § 416.920(g). At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. Here, the ALJ relied on the VE's revised testimony regarding the availability of cafeteria attendant, parking lot attendant and price marker jobs in the local and national economies to conclude that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Dec. 8, Tr. 28). Accordingly, the ALJ found that Dorman was not disabled. As detailed below, the VE's exclusive reliance on SkillTran's numbers about these positions warrants the remand of this matter for further evaluation.

Additional factual details relevant to this court's analysis are described below where appropriate.

### III. ANALYSIS

13

A.   **Standard of Review**

Dorman is seeking judicial review of the Commissioner's "final decision" pursuant

to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act").  The Act provides in

relevant part that:

> Any individual, after any final decision of the Commissioner of
> Social Security made after a hearing to which he was a party,
> irrespective of the amount in controversy, may obtain a review of
> such decision by a civil action .... The court shall have power to
> enter, upon the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the Commissioner
> of Social Security, with or without remanding the cause for a re-
> hearing.  The findings of the Commissioner of Social Security as to
> any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added).  The Supreme Court has defined "substantial

evidence" to mean "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson

v.Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126

(1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991).

It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in
> mind that "issues of credibility and the drawing of permissible
> inference from evidentiary facts are the prime responsibility of the
> [Commissioner]."  The [Commissioner] may (and, under his
> regulations, must) take medical evidence.  But the resolution of
> conflicts in the evidence and the determination of the ultimate
> question of disability is for him, not for the doctors or for the courts.

14

> We must uphold the [Commissioner's] findings in this case if a
> reasonable mind, reviewing the record as a whole, could accept it as
> adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Thus,

"the court's function is a narrow one limited to determining whether there is substantial

evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315,

319 (1st Cir. 1981).  The Commissioner's decision must be affirmed, "even if the record

arguably could justify a different conclusion, so long as it is supported by substantial

evidence."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.

1987), cert. denied, 484 U.S. 1012, 108 S. Ct. 713, 98 L. Ed. 2d 663 (1988).       "Even

in the presence of substantial evidence, however, the Court may review conclusions of

law, and invalidate findings of fact that are 'derived by ignoring evidence, misapplying

the law, or judging matters entrusted to experts[.]'"  Musto v. Halter, 135 F. Supp. 2d

220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)

(per curiam)) (internal citations omitted).  "Thus, if the ALJ made a legal or factual error,

the court may reverse or remand such decision to consider new, material evidence or to

apply the correct legal standard."  Ross v. Astrue, Civil Action No. 09-11392-DJC, 2011

WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

**B.**     **Testimony Regarding Numbers of Jobs**

The plaintiff's principal challenge to the ALJ's decision is that it is based on

unreliable testimony from the VE regarding numbers of jobs available in the regional and

national economies for an individual of Dorman's age, education, work experience and

RFC. Specifically, the plaintiff argues that

> [t]he VE's testimony was inherently unreliable for at least two
> reasons. First, the VE's testimony concerning the job numbers to
> which he testified are mere speculation derived from unsupported
> extrapolations from aggregate occupational groupings to the
> proffered DOT occupations. The VE, moreover, conceded that he
> was not aware of the methodology used to derive the DOT-specific
> job number estimates. As such, the VE's job number testimony did
> not reflect any valid expertise on his part and, therefore, was not
> probative with respect to actual job numbers.

(Pl. Mot. at 4). For the reasons that follow, this court finds that the VE's job number

testimony did not constitute substantial evidence because it was based solely on the

numbers provided by the Job Browser Pro software and did not reflect any expertise on

his part. Therefore, the ALJ's reliance on that testimony was in error.

Although it appears that few courts have addressed similar challenges to a VE's

job number testimony, those that have done so have distinguished cases in which the VE

relied solely on raw numbers generated by a computer software program or set forth in a

written publication from cases in which the VE relied on both the published numbers and

the VE's own expertise. For example, in Clark v. Astrue, Civil No. 09-390-P-H, 2010

WL 2924237 (D. Me. July 19, 2010), the ALJ relied on the VE's testimony regarding the

numbers of jobs available in the regional and national economies to find that the claimant

was not disabled at step five in the sequential analysis. Clark, 2010 WL 2924237, at *2-

3. On appeal, the plaintiff challenged the validity of the numbers, arguing, among other

16

things, that the numbers represented groupings of jobs rather than specific DOT code-identified jobs. Id. at *3.  In response, the Commissioner argued that the VE's testimony was reliable because "(i) no published authority sets forth numbers of specific DOT code-identified jobs existing in the national economy and (ii) that is precisely why the commissioner obtains the testimony of vocational experts, who rely not just on published raw numbers but also on their experience and expertise." Id.  However, the court rejected the Commissioner's arguments and held that the VE's testimony did not constitute substantial evidence that the specific jobs at issue existed in significant numbers in the national economy.  Id.  As the court found, "the vocational expert in this case essentially admitted that he did in fact rely on published raw numbers, which pertained not to the specific DOT code-identified jobs at issue but rather to groups of jobs of differing skill and exertional levels that happened to contain the three specific jobs." Id. (emphasis omitted).  Thus, in Clark, the VE did not rely on his own expertise to support his testimony regarding numbers of jobs available in the national economy.

However, in the case of  Woodard v. Astrue, No. 1:10-cv-327-DBH, 2011 WL 2580641 (D. Me. Jun. 28, 2011), adopted by 2011 WL 2890371 (D. Me. Jul. 19, 2011), the same Magistrate Judge who decided Clark rejected a similar challenge by the plaintiff to the reliability of the VE's job number testimony.  In that case, the VE admitted during the hearing that, like the VE in Clark, she had based her conclusions on published numbers that were derived from census codes representing groups of DOT code-identified jobs involving different exertional and skill levels.  Woodard, 2011 WL

17

2580641, at *5.  Significantly, however, the VE further testified that "based on her professional experience, the numbers sounded realistic in terms of availability[.]"  Id. (quotations and citation omitted).  The Magistrate Judge determined that this additional testimony distinguished the matter from cases such as Clark, in which the VE did not rely on his or her own professional expertise to support an opinion as to the number of jobs in the regional and national economies.  See id.  Accordingly, the Magistrate Judge found that the ALJ's reliance on the VE's testimony was appropriate.  See id. at *6.

Just last year, the same Magistrate Judge reached a similar conclusion to the one that he reached in Woodard when the plaintiff in Poisson v. Astrue challenged the VE's reliance on the Job Browser Pro software that is at issue here.  In that case, the plaintiff acknowledged that the Job Browser Pro program, unlike other programs, generated numbers for specific DOT code-identified jobs and not just for SOC code groupings of jobs.  See Poisson v. Astrue, No. 2:11-cv-245-NT, 2012 WL 1067661, at *8 n.4 (D. Me. Mar. 28, 2012) (slip op.), adopted by 2012 WL 1416669 (D. Me. Apr. 24, 2012). Nevertheless, the plaintiff argued that the VE's testimony was unreliable because she admitted that she did not understand how the computer program converted the data into DOT job occupation numbers, and therefore based her testimony on an unknown statistical methodology rather than on her own knowledge and experience.  Id. at *9.

The Poisson court rejected the plaintiff's arguments and found that the VE did rely on her own expertise.  See id.  Specifically, the court noted that during her testimony, the VE stated that in her opinion, the "the numbers were accurate and had 'great integrity,

using this particular software.'"  Id.  Thus, as the court found:

> [w]hile the vocational expert may not have known, in precise
> technical detail, how the Job Browser Pro system worked, she
> explained why she thought that the underlying data was reliable and
> endorsed the numbers derived therefrom as accurate.  She, thus,
> relied on her professional experience and expertise, and not strictly
> on a software program, in endorsing the numbers provided to the
> administrative law judge.  In such circumstances, this court has held
> vocational testimony as to job numbers sufficiently reliable to
> support a Step 5 finding.

Id.

In the instant matter, the VE provided numbers for the specific DOT occupations of parking lot attendant, cafeteria attendant and price marker, and the ALJ relied on those numbers in support of his finding that Dorman was not disabled from working.  (See Tr. 65-66 and compare with Dec. 8, Tr. 28).  However, unlike the VEs in Woodard and Poisson, the VE in Dorman's case admitted that his testimony was based solely on the raw numbers generated by the Job Browser Pro software and not on his own expertise. (See Tr. 67-68, 71).  He also admitted that while he understood that SkillTran relies on national staffing patterns to calculate the numbers of jobs available in the national and regional economies, he did not know how SkillTran arrives at its numbers.  (Tr. 68). Therefore, this court finds that the ALJ's reliance on the VE's testimony in this case was in error.

The Commissioner's argument that the VE's testimony was based on knowledge and experience as well as on software data is unpersuasive.  (See Def. Mem. (Docket No. 13) at 14).  Although the VE testified that he had placed people in parking lot attendant,

cafeteria attendant, and price marker jobs, and was aware of general industry employment trends based on his 30 years of experience in the field, he specifically confirmed that he relied exclusively on SkillTran's computer software, and not on any other experience, to provide the job numbers for those particular occupations.  (See Tr. 68-71).  Moreover, while the VE noted that SkillTran believes its numbers are more reliable than state regional staffing levels (Tr. 67), he rendered no opinion as to the accuracy of those numbers and did not otherwise endorse the information provided by SkillTran's Job Browser Pro software.  Compare Nichols v. Astrue, Civil Action No. 10-11641-DPW, 2012 WL 474145, at *12-13 (D. Mass. Feb. 13, 2012) (slip op.) (rejecting plaintiff's challenge to VE's testimony as to numbers of jobs in the regional and national economies where VE did not simply cite "the raw numbers with no further elucidation or statement of the accuracy of their estimates[,]" but rather testified "that the numbers she gave were the best information available"); Poisson, 2012 WL 1067661, at *9 (rejecting plaintiff's challenge to reliability of VE's testimony where VE "explained why she thought that the underlying data was reliable and endorsed the numbers derived therefrom as accurate").  Accordingly, the plaintiff's motion to reverse and remand should be allowed on this basis.

### C.    **Plaintiff's Challenge to the RFC**

The plaintiff also argues that the ALJ's reliance on the VE's testimony was improper because that testimony was based on a hypothetical question that did not accurately reflect the medical evidence regarding Dorman's mental limitations.  (See Pl.

Mot. at 7-8).  In order to qualify as substantial evidence, "the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations."  Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011).  For the reasons that follow, this court finds that the mental RFC described by the ALJ in his hypothetical question to the VE did not incorporate all of Dorman's mental limitations. Nevertheless, this court also finds that this omission does not constitute reversible error.

## Evidence of Anxiety and Personality Disorders

Dorman argues that "[t]he serious problems associated with the ALJ's RFC finding began at Step 2, where the judge simply ignored medically determinable (and likely severe) mental impairments."  (Pl. Mot. at 8).  Specifically, according to the plaintiff, the ALJ committed serious error by failing to consider medical evidence indicating that Dorman was suffering from an anxiety disorder and a personality disorder, which were "in all likelihood, severe[,]" at step 2 of the sequential analysis  (Id.).  However, this argument is without merit.  The plaintiff's assertion that the ALJ ignored evidence that she was suffering from an anxiety disorder and a personality disorder is undermined by the record.  Moreover, to the extent the ALJ erred by failing to include those disorders among the severe impairments listed in his finding at step 2, this court concludes that any such error was harmless.

Although the ALJ did not explain the basis for his finding at step 2 that Dorman was suffering from the severe impairments of depressive disorder, trochanteric bursitis in her hips and back pain, (see Dec. 3, Tr. 23), the record demonstrates that the ALJ

specifically considered evidence indicating that Dorman was suffering from anxiety and depressive disorders in reaching his ultimate determination that the plaintiff was not disabled.  Specifically, in his written decision, the ALJ noted that Dr. Brooks had diagnosed the plaintiff with depressive disorder not otherwise specified, and anxiety disorder not otherwise specified, among other things.[6]  (Dec. 6, Tr. 26).  The ALJ also addressed Dorman's allegation that she suffered from disabling anxiety in connection with his assessment of the plaintiff's credibility.  (Dec. 7, Tr. 27).  For example, the ALJ found that although Dorman was claiming disability due to depression and anxiety, the medical evidence showed that she had taken Zoloft and had found it helpful.  (Id.).  He also noted that that she did not participate in therapy for her psychiatric symptoms, and that during her consultation with Dr. Brooks, she could not describe symptoms of depression or anxiety that adversely impacted her ability to perform activities of daily living, social functioning, or concentration, persistence or pace.  (Id.).   Accordingly, contrary to the plaintiff's claim, the ALJ did not ignore available medical evidence indicating that Dorman was suffering from anxiety and personality disorders.

Moreover, even if the ALJ did err by failing to include the plaintiff's alleged anxiety and personality disorders in his step 2 finding, any such error "would be harmless

---

[6] Although the ALJ did not specifically address the fact that Dr. Aisenberg also diagnosed Dorman with personality and anxiety-related disorders, he credited her findings and found that they were consistent with Dr. Brooks' conclusions regarding Dorman's mental limitations.  (See Dec. 6-7, Tr. 26-27).  Accordingly, the plaintiff's assertion that the ALJ ignored Dr. Aisenberg's diagnoses is not supported by the record.

because once one severe impairment is found, an ALJ must consider all severe and non-severe impairments in the remainder of the sequential analysis." <u>Farren v. Astrue</u>, Civil Action No. 10-11103-DPW, 2012 WL 463809, at *7 n.5 (D. Mass. Feb. 10, 2012) (slip op.).  Here, the ALJ properly proceeded to step 3 of the analysis based on his finding that Dorman's depressive disorder, trochanteric bursitis and back pain were severe under the Social Security Act.  Moreover, as described above, the ALJ did consider the anxiety and personality disorder diagnoses in connection with the remainder of his analysis. "Therefore, any error at step two was harmless" and does not provide a separate basis for remanding the matter to the ALJ.[7]  <u>Id.</u>

### Alleged Failure to Credit Dr. Aisenberg's Assessment

The plaintiff also argues that the ALJ committed reversible error because, in crafting his RFC, the ALJ failed to account for Dr. Aisenberg's assessment that Dorman's work pace would be uneven due to her pain and psychological symptoms, that she could only concentrate on routine tasks for up to 2 hours in an 8 hour time span, and that Dorman had moderate limitations in social functioning.  (Pl. Mot. at 9-12; Pl. Reply Mem. (Docket No. 14) at 4-5).  Although this court agrees that the ALJ's findings regarding the plaintiff's mental RFC did not adequately account for the limitation in Dorman's ability to maintain an even pace, this court finds that this failure did not

---

[7]  In light of this court's conclusion that any error at step 2 was harmless, this court finds that it is unnecessary to address the parties' dispute as to whether the plaintiff has shown that her personality disorder and anxiety disorder were "severe" within the meaning of the Social Security Act.

constitute reversible error.  This court further finds that the ALJ's mental RFC assessment was otherwise supported by substantial evidence in the record.

<u>Dr. Aisenberg's Opinions</u>

The record shows that on November 23, 2009, Dr. Aisenberg completed a Mental Residual Functional Capacity ("MRFC") Assessment form based on her review of the medical evidence.  (<u>See</u> Tr. 463-66).  In Section I of the form, entitled "Summary Conclusions," Dr. Aisenberg checked off boxes indicating the extent to which she believed Dorman was impaired in various areas of mental functioning.  (Tr. 463-64).  Dr. Aisenberg indicated that Dorman was moderately limited in 3 out of 8 areas of concentration, persistence or pace, in 1 out of 5 areas of social interaction, and in 1 out of 4 areas of adaptation.  (Tr. 463-64).  She otherwise assessed Dorman as either not limited or not significantly limited in her ability to function mentally.  (Tr. 463-64).  In Section III of the form, entitled "Functional Capacity Assessment," Dr. Aisenberg provided a narrative assessment of Dorman's mental RFC.  (Tr. 465).  Specifically, Dr. Aisenberg stated that the plaintiff would be able to concentrate on routine tasks for up to 2 hours over an 8 hour time span, and could carry out such tasks, but that "[h]er work pace would be uneven" as a result of her pain and psychological symptoms.  (<u>Id.</u>).  Although she noted that Dorman reported a reluctance to leave home, Dr. Aisenberg opined that "[the plaintiff] would be able to do so as needed."  (<u>Id.</u>).  Furthermore, Dr. Aisenberg stated that Dorman's ability to adapt to stress would be limited.  (<u>Id.</u>).  However, she concluded that the plaintiff "remains capable of completing simple, routine tasks."  (<u>Id.</u>).  As

described above, the ALJ found that Dr. Aisenberg's opinions were consistent with the findings of Dr. Brooks, and that Dr. Brooks' conclusions were entitled to "great weight" because they were "consistent with the medical record as a whole."  (See Dec. 6 -7, Tr. 26-27).  Thus, the ALJ endorsed the opinions of Dr. Aisenberg regarding the plaintiff's mental RFC.

Alleged Failure to Account for Uneven Work Pace

In connection with his assessment of Dorman's RFC, the ALJ concluded that Dorman retained the mental capacity to perform light work "except she can only perform simple, routine repetitive tasks, which require limited concentration."  (Dec. Finding #4, Tr. 24).  However, as the plaintiff points out, the ALJ did not include Dr. Aisenberg's conclusion that the pace of Dorman's work would be uneven.  (See id.).  Nor did he include such a limitation in his first hypothetical to the VE.  (See Tr. 57-58).  Therefore, although the ALJ purported to accept Dr. Aisenberg's opinions, his RFC did not reflect all of the mental limitations described by Dr. Aisenberg in her MRFC form.

The Commissioner argues that the ALJ's RFC finding did reflect Dr. Aisenberg's opinion that Dorman's work pace would be uneven because it limited the plaintiff to simple, routine, repetitive tasks requiring limited concentration.  (Def. Mem. at 18).  This court disagrees.  In her narrative assessment of Dorman's RFC, Dr. Aisenberg indicated that a restriction to routine tasks would compensate for the limitations in Dorman's ability to concentrate, and that a restriction to simple, routine tasks would compensate for her limited ability to adapt to stress.  (See Tr. 465).  However, she did not suggest that

25

such restrictions would compensate for the fact that Dorman's pace would remain uneven due to her pain and psychological symptoms.  (See id.).

Furthermore, the Commissioner has not explained how a limitation to simple, routine, repetitive tasks requiring limited concentration takes into account deficiencies in pace.  As the Third Circuit stated in the case of Ramirez v. Barnhart, "[m]any employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time."  372 F.3d 546, 554 (3d Cir. 2004).  In fact, during his testimony at the hearing, the VE testified that the claimant would not be capable of performing the parking lot attendant job if she did not maintain an even work pace.  (See Tr. at 60-61).  Accordingly, the VE did not understand the ALJ's first hypothetical, which included the restriction to simple, routine, repetitive tasks requiring limited concentration, to encompass a limitation on work pace.  The ALJ should have addressed Dorman's uneven pace in connection with his assessment of her mental RFC and in his hypothetical question to the VE.

Nevertheless, this court finds that the ALJ's failure to include such a limitation in his RFC assessment was harmless and does not constitute reversible error.  During the administrative hearing, the plaintiff's counsel asked the VE whether the plaintiff would be precluded from working if she had an uneven work pace as a result of her pain.  (Tr. 60-61).  Although the VE testified that this limitation would eliminate the parking lot attendant job, he stated that the plaintiff would still have the ability to perform the work

of a cafeteria attendant and a price marker.  (See Tr. 61).  Thus, even if the ALJ's RFC

assessment had been adjusted to account for Dorman's inability to maintain a consistent

work pace, it would not have altered the VE's opinion that the plaintiff had the capacity

to carry out gainful employment.

Alleged Failure to Account for Limitation in Concentration

This court also finds that the ALJ did not commit reversible error by failing to

acknowledge Dr. Aisenberg's assessment that the plaintiff could only concentrate on

routine tasks for up to 2 hours over an 8 hour time span.  (See Pl. Mot. at 11-12).  "The

Social Security Administration's Program Operation Manual explains 'that the mental

abilities needed for any job include the ability to understand, remember, and carry out

simple instructions by, ... maintaining concentration and attention for extended periods

(the approximately 2-hour segments between arrival and first break, lunch, second break,

and departure).'"  McGrath v. Astrue, Civil No. 10-cv-455-JL, 2012 WL 976026, at *6

(D.N.H. Mar. 22, 2012) (slip op.) (quoting Baker v. Comm'r Soc. Sec. Admin., No. 1:10-

cv-00167-JAW, 2011 WL 1298694, at *4 (D. Me. Mar. 31, 2011)).  Consequently,

> Courts ... have recognized that "a DDS consultant's assessment of a
> capacity for concentration in two-hour blocks merely indicates that a
> claimant crosses the threshold for having a residual functional
> capacity for unskilled work, without imposing a cincture on the
> claimant's mental capacity that must be explained away by [the ALJ]
> if it is not incorporated into an RFC finding."

Id. (quoting Baker, 2012 WL 1298694, at *6) (alteration in original).  The ALJ's

omission of the 2-hour block restriction from his mental RFC finding was appropriate and

27

does not require a remand.

<u>Alleged Failure to Account for Limitations in Social Functioning</u>

The plaintiff contends that the ALJ nevertheless erred by failing to incorporate Dorman's moderate limitations in social functioning into his RFC assessment and his hypothetical question to the VE.  (Pl. Reply Mem. at 4-5).  Again this court disagrees.  In Section I of her MRFC Assessment form, Dr. Aisenberg checked off a box indicating that Dorman was moderately limited in 1 of 5 areas of social interaction.  (Tr. 464).  Dr. Aisenberg also completed a PRTF in which she checked off a box indicating that Dorman had moderate difficulties in maintaining social functioning.  (Tr. 459).  However, "[t]he ALJ is under no obligation to accept the 'check-box conclusions' found in Section I of the Mental RFC form.  Instead, as provided on the face of the form itself, the criteria found in Section I of the form should be used to provide a more detailed assessment of RFC in Section III of the form."  <u>Pippen v. Astrue</u>, No. 1:09cv308, 2010 WL 3656002, at *6 (W.D.N.C. Aug. 24, 2010), <u>adopted</u> by 2010 WL 3655998 (W.D.N.C. Sept. 15, 2010).  As the Social Security Administration has explained in its Program Operations Manual:

> The purpose of section I ("Summary Conclusion") [of the MRFC form] is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis.  It is the narrative written by the psychiatrist or psychologist in section III ('Functional Capacity Assessment') of [the MRFC form] that adjudicators are to use as the assessment of RFC.  Adjudicators must take the RFC assessment in section III and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the

mental demands of past work or other work.

Id. (quoting POMS DI 25020.010.B.1) (emphasis omitted; alterations in original). See also Aponte v. Astrue, No. C11-5671-JCC-BAT, 2012 WL 2882988, at *8 (W.D. Wash. Jun. 7, 2012) (slip op.) ("it is clear the ALJ acted in accordance with the agency's established procedures when he relied on the narrative portion of [the State Agency psychologist's] opinion set forth in the Functional Capacity Assessment rather than on the limitations recorded in the Summary Conclusions section"), adopted by 2012 WL 2882751 (W.D. Wash. Jul. 12, 2012). Therefore, the ALJ was required to look to the narrative in Section III of Dr. Aisenberg's MRFC Assessment form to determine what Dr. Aisenberg meant by moderate limitations in Dorman's social functioning.

In her narrative assessment of Dorman's functional capacity, Dr. Aisenberg made the following comment with respect to Dorman's social limitations: "[a]lthough Cl reports reluctance to leave home, she would be able to do so as needed." (Tr. 465). Accordingly, Dr. Aisenberg did not suggest that the plaintiff's social limitations would interfere with her ability to work. Moreover, Dr. Aisenberg's assessment of Dorman's social functioning was consistent with Dr. Brooks' consultative examination report, in which he noted that Dorman's "social functioning is highlighted by isolation, but she did not report any specific problems interacting with others." (Tr. 439). Therefore, the ALJ's omission of any reference to Dorman's social functioning in his RFC assessment was supported by substantial evidence in the record.

In sum, with the exception of Dr. Aisenberg's determination that Dorman would

have an uneven work pace as a result of her pain, the plaintiff has not shown that the

ALJ's assessment of her mental RFC was inconsistent with Dr. Aisenberg's opinion

regarding her mental limitations.  Because this court finds that the ALJ's failure to

account for the plaintiff's uneven pace amounted to harmless error, the plaintiff has not

shown that she is entitled to a remand on the grounds that the ALJ's RFC finding and

hypothetical question to the VE did not accurately reflect the medical record.

Nevertheless, in light of this court's conclusion that the matter should be remanded for

other reasons, this court recommends that the ALJ reconsider his finding regarding

Dorman's mental RFC.

## IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that the "Defendant's Motion to Affirm the Commissioner's

Decision" (Docket No. 12) be DENIED, that the plaintiff's "Motion to Reverse" (Docket

No. 11) be ALLOWED, and that the matter be remanded to the ALJ for further

proceedings[8] consistent with this Report and Recommendation.[9]

---

[8]  This court expresses no opinion as to the appropriate outcome of additional administrative proceedings.

[9]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v.

                                        / s / Judith Gail Dein
                                        Judith Gail Dein
                                        United States Magistrate Judge

---

Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616
F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982);
Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-
54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp.,
199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir.
1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).